UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

*FOR PUBLICATION*

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 23-01017 (CGM) |
| v. | |
| NATIXIS FINANCIAL PRODUCTS LLC and BLOOM ASSET HOLDINGS FUND, | |
| Defendants. | |

**MEMORANDUM DECISION
DENYING DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:     Joanna F. Wasick
        Carlos Ramos-Mrosovsky

*Attorneys for Defendants Natixis Financial Products LLC (as successor in interest to Natixis Financial Products Inc.) and Bloom Asset Holdings Fund.*
DAVIS+GILBERT LLP
1675 Broadway
New York, NY 10019
By:    H. Seiji Newman

## CECELIA G. MORRIS
## UNITED STATES BANKRUPTCY JUDGE

Pending before the Court is the motion of the Defendants, Natixis Financial Products LLC (as successor in interest to Natixis Financial Products Inc.) ("Natixis FP") and Bloom Asset Holdings Fund ("Bloom," and together with Natixis FP, "Defendants"), to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly consisting of BLMIS customer property received from from Groupement Financier Limited ("Groupement") and Groupement Financier Levered Limited ("Groupement FLL").  Defendants argue that the Trustee released them from these claims in a prior settlement agreement in *Picard v. HSBC Bank PLC*, Adv. Pro. No. 09-01364 (CGM) (Bankr. S.D.N.Y.) (the "Alpha Prime Action").  Defendants seek dismissal of Count I under the doctrine of laches and dismissal as to all counts due to lack of personal jurisdiction, for failure to allege avoidability of the initial transfers, and for failure to allege that they received BLMIS customer property.  Defendants assert the affirmative defense of "good faith" and the safe harbor provisions of the Bankruptcy Code.  For the reasons set forth herein, the motion to dismiss is denied in its entirety.

## **Jurisdiction**

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L.*

*Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1),

and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  Personal

jurisdiction has been contested by Bloom and will be discussed *infra*.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme and its

SIPA proceeding.  *See Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 178–83 (2d Cir.

2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on March 1, 2023.  (Compl., ECF[1] No. 1).  Via the

complaint (the "Complaint"), the Trustee seeks to recover over $234 million in subsequent

transfers of customer property that Defendants allegedly received from Groupement and

Groupement FLL.  (*Id.* ¶ 5).

Natixis FP is a Delaware corporation and financial services company.  (*Id.* ¶ 10).  Its

principal place of business is in New York, New York.  (*Id.*).  Bloom is an "Irish umbrella trust"

that was operated and controlled by affiliates based in New York, as well as by Defendant

Natixis FP and by Natixis Securities North America Inc., now known as Natixis North America

LLC.  (*Id.* ¶ 11).  Bloom was "wholly owned by affiliates of Natixis FP, had the same ultimate

parent company as Natixis FP, and used Natixis Securities North America as its investment

adviser."  (*Id.* ¶ 12).

---

[1] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic
docket in adversary proceeding 23-01017-cgm.

The Complaint alleges that Bloom invested in various funds whose sole purpose was to invest with BLMIS. (*Id.* ¶¶ 2, 12). Bloom made investments with other funds that "did not permit direct investments by U.S. persons." (*Id.*). Assets in these funds were held by Bloom through a sub-fund called Blossom Asset Holdings Fund. (*Id.*).

Groupement is a British Virgin Islands investment fund, which invested 100% of its assets directly with BLMIS. (*Id.* ¶ 3). Groupement FLL was an affiliate of Groupement. (*Id.* ¶ 4). Groupement received approximately $352 million in avoidable initial transfers of customer property from BLMIS, which the Trustee has sued to avoid in *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (CGM) (Bankr. S.D.N.Y.) (the "Luxalpha Action"). This Court has already found in the Luxalpha Action that the Trustee pleaded sufficient allegations of Groupement's actual knowledge that no securities were being traded. *Picard v. UBS AG (in re BLMIS)*, 647 B.R. 42, 62 (Bankr. S.D.N.Y. 2022).

The Complaint alleges that the Defendants invested with BLMIS by engaging in various swaps and related hedges with the Groupement and Groupement FLL. (*Id.* ¶¶ 3–4, 61–69). A swap is a transaction whereby a party "swaps" cash flows derived from a reference asset for another set of cash flows from its counterparty. (*Id.* ¶ 61). This allows a party to receive returns from an "underlying reference asset without actually owning that asset, in exchange for fees paid to the other party." (*Id.*). The ownership of the reference asset is not transferred in this sort of swap; only the cash flows representing the returns that reference asset generates are swapped. (*Id.*). A swap allows an institution like Natixis FP to provide "simulated or 'synthetic' leverage by paying to its counterparty cash flows equal to a multiple of the return on an amount notionally invested in a reference asset." (*Id.* ¶ 62). The institution then receives collateral and fees from the counterparty. (*Id.*). The institution pays the counterparty the returns, less fees, that the

counterparty would have received had it actually borrowed money and invested that money in the underlying asset.  (*Id.*).  The institution will then "typically acquire a corresponding position in the underlying reference asset for its own account" as a hedge.  (*Id.* ¶ 63).

The Complaint alleges that Defendants engaged in swaps for which Groupement was the reference asset and Groupement FLL was the counterparty.  (*Id.* ¶¶ 64–65).  In this "Groupement Swap," Natixis FP paid returns to Groupement FLL based on performance of a notional investment in Groupement.  (*Id.* ¶ 65).  Groupement FLL gave collateral to Natixis FP equal to "approximately half the amount to be notionally invested in the reference asset, and paid Natixis FP a floating rate based on LIBOR."  (*Id.*).  This Groupement Swap gave Groupement FLL a two-times leveraged investment in Groupement "and by extension in BLMIS."  (*Id.* ¶ 66).

Natixis FP itself was unable to invest in Groupement as "Groupement was closed to U.S. investors."  (*Id.* ¶¶ 4, 67).  In order to hedge its obligations in the Groupement Swap, Natixis FP entered into an agreement with Bloom, an Irish entity.  (*Id.* ¶ 67).  Bloom acquired Groupement shares equal to Groupement FLL's notional leveraged investment and was required by its agreement with Natixis FP to transfer to Natixis FP all positive returns.  (*Id.*).  The Complaint alleges that Bloom received several redemptions from Groupement as a result of this arrangement.

The Groupement Swap between Natixis FP and Groupement FLL, was extended in 2007 for five years, but it was terminated in 2008 at Groupement FLL's request.  (*Id.* ¶ 69).  The termination of the swap was accomplished through an "in-kind transfer directly to [Groupement FLL] of the Groupement shares that had been held by Bloom as a hedge for Natixis FP's obligations under the Groupement Swap."  (*Id.*).  Groupement FLL then redeemed the shares in order to pay Natixis FP the "implied loan" that it had received under the Groupement Swap

agreement. (*Id.*). Over $153 million in funds was paid to Natixis FP from funds ultimately derived from BLMIS. (*Id.*).

The Trustee commenced an adversary proceeding against Groupement and others in the Luxalpha Action on November 23, 2010. (Compl., Luxalpha Action ECF No. 1). In that proceeding, the Trustee seeks to avoid and recover approximately $352 million in transfers of BLMIS customer property made to Groupement during the six years prior to the filing date. (*Id.* ¶ 70). Of that, approximately $275 million was transferred to Groupement during the two years prior to the filing date. (*Id.* ¶ 71). The Trustee alleges in that action that each transfer was received by Groupement "with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Groupement to inquire further into the BLMIS fraud." (*Id.* ¶ 75).

The Complaint alleges that at least $234 million was transferred by Groupement to the Defendants pursuant to the Groupement Swap, either directly or indirectly. (*Id.* ¶ 77). Based on the Trustee's investigations to date, "at least $80.9 million was transferred from Groupement to Bloom" under the hedging agreement and "at least $153 million was transferred from [Groupement] FLL to Natixis FP," after Groupement FLL obtained those funds by redeeming Groupement shares. (*Id.* ¶ 78–79). These alleged transfers to Defendants are subsequent transfers of BLMIS customer property. The Trustee seeks recovery of these transfers under § 550(a) of the Code and applicable SIPA provisions. (*Id.* ¶ 80).

In their motion to dismiss, Defendants argue that the Complaint fails to allege that Defendants received BLMIS customer property, that the Complaint fails to allege avoidability of the initial transfers, and that the Complaint fails to plead the initial transferee's actual knowledge of the fraud due to improper incorporation by reference. (Mem. L, ECF No. 18). Defendants

assert that the affirmative defenses of "value," "good faith," and "without knowledge of voidability;" and the § 546(e) and 546(g) "safe harbor." Bloom argues that that this Court lacks personal jurisdiction over it. The Defendants allege that Count I, for recovery of subsequent transfers asserted against Natixis FP, is barred by the doctrine of laches. The Trustee opposes the motion to dismiss. (Opp'n, ECF No. 22).

Parties entered into a stipulation limiting oral argument to issues related to the purported release in the Alpha Prime Settlement, the 546(g) safe harbor, and the doctrine of laches. (Stip. and Order, ECF No. 26). The Court heard oral arguments on October 18, 2023. (*See* Hr'g Tr., Oct. 18, 2023, ECF No. 30).

## Discussion

### Personal Jurisdiction

Defendant Bloom objects to the Trustee's assertion of personal jurisdiction. In the Complaint, the Trustee argues that Bloom purposefully availed itself of the laws of the United States and New York. (Compl. ¶ 14–16, ECF No. 22).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "'It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank,*

*N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*, 722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (same). At the pre-discovery stage, the allegations need not be factually supported. *See Dorchester Fin. Securities Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013) (an averment of facts is necessary only after discovery).

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *Picard v. BNP Paribas S.A.* (*In re BLMIS)*, 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018).

> The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant. First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). "Although a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

A party "purposefully avail[s] itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in [a BLMIS feeder fund] would be transferred to BLMIS in New York to be invested in the New York securities market." *BLI*, 480 B.R. at 517.

In the Complaint, the Trustee alleges that Defendant Bloom was operated by New York-based entities in order to enable investments with BLMIS in New York. (Compl. ¶¶ 15–16, ECF No. 1). Defendant Natixis FP and other Natixis entities in New York "operated and managed" Bloom. (*Id.* ¶ 15). Employees of these New York entities directed Bloom's "investments in and redemptions from Groupement and other Feeder Funds." (*Id.*) ; (*see also id.* ¶ 11) ("Natixis FP's managing director served as Bloom's Financial Industry Regulatory Authority registered representative of record.").

Bloom's entire reason for being was to facilitate investment of a New York entity, Natixis FP, into a BLMIS feeder fund, "under swap transactions in New York governed by New

York law." (*Id.* ¶¶ 3, 15). "Any return on Bloom's investments in Groupement would result from BLMIS purportedly engaging in the purchase and sale of securities in New York." (*Id.* ¶ 15). In connection with the transfers at issue, Bloom "undert[ook] significant commercial activities in New York, and derived significant revenue from New York." (*Id.* ¶ 14). Bloom purposefully invested in Groupement while knowing that 100% of its assets were invested in in New York-based BLMIS. (*Id.* ¶¶ 3, 15, 68). Bloom knew that any returns would be due to BLMIS's supposed securities purchases and sales in New York. (*Id.*). As part of its agreement with Natixis FP, Bloom paid fees to its parent company, Natixis Securities North America, a New York-based company. (*Id.* ¶ 15). Bloom received redemptions from Groupement after Natixis employees in New York directed it to do so. (*Id.* ¶ 67).

The Complaint contains allegations that are legally sufficient to constitute a prima facie showing of jurisdiction. *Dorchester Fin. Securities Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). "[Defendant] intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012). Bloom's alleged contacts with New York are not random, isolated, or fortuitous.

**Arise out of or relate to the Defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came

about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, the court

need only find "an affiliation between the forum and the underlying controversy." *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.*

(*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with

the jurisdiction that relate to the cause of action are more substantial, however, it is not

unreasonable to say that the defendant is subject to personal jurisdiction even though the acts

within the state are not the proximate cause of the plaintiff's injury.") (internal quotations

omitted).

Here, the Trustee is asserting subsequent transfer claims against Bloom for monies it

received from the BLMIS feeder fund, Groupement. (Am. Compl. ¶¶ 77–80, 87–89). These

allegations are directly related to its investment activities with the feeder fund. *See BNP Paribas*

*S.A.* 594 B.R. at 191 (finding that the redemption and other payments the defendants received as

direct investors in a BLMIS feeder fund arose from the New York contacts such as sending

subscription agreements to New York, wiring funds in U.S. dollars to New York, sending

redemption requests to New York, and receiving redemption payments from a Bank of New

York account in New York, and were the proximate cause of the injuries that the Trustee sought

to redress). The suit is affiliated with the alleged in-state conduct. *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

**Reasonableness**

Having found sufficient minimum contacts, the Court must determine if exercising

personal jurisdiction over the Defendants is reasonable and "comport[s] with fair play and

substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal

quotations omitted). Factors the Court may consider include the burden on the defendant, the

forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Id.* at 477.

The exercise of jurisdiction is reasonable. Bloom is not burdened by this litigation. Defendant was a company set up to facilitate investment by U.S. persons in BLMIS feeder funds. Those persons have actively participated in this litigation since its commencement. Bloom is represented by U.S. counsel and knowingly invested with New York-based feeder funds. Additionally, both the forum and the Trustee have a strong interest in litigating the BLMIS adversary proceedings in this Court. The forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").

By alleging that Defendants intentionally invested in BLMIS through a known BLMIS feeder fund, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. And by alleging that Defendants received funds from investments with a BLMIS feeder fund on account of a New York-based swap and hedge agreements, the Trustee has met his burden of alleging jurisdiction over each transfer that received through a New York bank account.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019).  The Trustee has made a prima facie showing of personal jurisdiction with respect to all of the subsequent transfers at issue in this Complaint.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").  In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief.  *Iqbal*, 556 U.S. at 679.  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] .

. . documents incorporated in it by reference[,]" and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A

document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous

information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F.

Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

　　　The Trustee is seeking to recover subsequent transfers made to Defendants by

Groupement and Groupement FLL.

**Recovery of Subsequent Transfers**

　　　Pursuant to § 550(a) of the Bankruptcy Code, a trustee is entitled to recover avoided

transfers of customer property from initial transferees as well as from "any immediate or mediate

transferee of such initial transferee." 11 U.S.C. § 550(a). "To plead a subsequent transfer claim,

the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent

transferee of that initial transferee, that is, that the funds at issue originated with the debtor."

*Picard v. BNP Paribas S.A. (In re BLMIS),* 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also*

*SIPC v. BLMIS (In re Consol. Proc. On 11 U.S.C. § 546(e))*("*Cohmad*"), No. 12 MC 115, 2013

WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013). "Federal Civil Rule 9(b) governs the portion of a

claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a

claim to recover the subsequent transfer." *BNP Paribas*, 594 B.R. at 195 (*citing Sharp Int'l*

*Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

　　　The Trustee only needs to provide "a short and plain statement of the claim showing that

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading

stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195.

Rather "[t]he plaintiff must allege the necessary vital statistics – the who, when, and how much –

of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.*

However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar

accounting of the exact funds at issue." *Id*.

While the Trustee must allege that the initial transfer from BLMIS to Groupement is

avoidable, he is not required to avoid the transfer received by the initial transferee before

asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin*

*Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005). The Trustee is free to pursue any of the

immediate or mediate transferees, and nothing in the statute requires a different result. *IBT Int'l,*

*Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706-07 (11th Cir. 2005).

The Trustee pleaded the avoidability of the initial transfer (from BLMIS to Groupement)

by adopting by reference the entirety of the complaint filed in the Luxalpha Action. (Compl. ¶

75, ECF No. 1) ("The Trustee incorporates by reference the allegations contained in paragraphs

1–17, 68–340 and 356–392 of the Luxalpha Complaint as if fully set forth herein."); (*see also*

Am. Compl., Luxalpha Action Adv. Pro. No. 10-04285, ECF No. 274) (the "Luxalpha

Complaint").

Whether the Luxalpha Complaint properly pleads the avoidability of the initial transfer, is

governed by Rule 9(b). Rule 9(b) states: "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee,
> applicable Second Circuit precedent instructs courts to adopt a more liberal view
> since a trustee is an outsider to the transaction who must plead fraud from second-
> hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of

personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011)

(cleaned up).

**Adoption by Reference**

The Trustee has adopted by reference allegations contained in the Luxalpha Complaint. (Compl. ¶ 75, ECF No. 1). Adoption by reference is governed by Rule 10 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 10(c). Rule 10(c) states: "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." The District Court found that adoption by reference of the entire Fairfield Complaint is proper. *See SIPC v. BLMIS* (*In re Consolidated Proceedings on 11 U.S.C. § 550(a)*), 501 B.R. 26, 36 (S.D.N.Y. 2013) ("The Trustee's complaint against Standard Chartered Financial Services incorporates by reference the complaints against Kingate and Fairfield, including the allegations concerning the avoidability of the initial transfers, and further alleges the avoidability of these transfers outright. Thus, the avoidability of the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes of section 550(a).") (cleaned up). Similarly, adoption of the Luxalpha Complaint in this proceeding is proper.

As was explained in *In re Geiger,* pleadings filed in the "same action" may be properly adopted by reference in other pleadings in that action. 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010). The Luxalpha Complaint was filed in the "same action" as this adversary proceeding for purposes of Rule 10(c). *Id.* Cases within this SIPA proceeding are filed in the same "proceeding"—the SIPA proceeding. *In re Terrestar Corp.*, No. 16 CIV. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) ("Adversary proceedings filed in the same bankruptcy

case do not constitute different cases."); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior decisions within this SIPA proceeding constitute law of the case . . . . "); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019), (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same main case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrastar Corp. (In re Terrestar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) ("Adversary proceedings filed in the same bankruptcy case do not constitute different cases."), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017); *Bourdeau Bros., Inc. v. Montagne (In re Montagne)*, No. 08-1024 (CAB), 2010 WL 271347, at *6 (Bankr. D. Vt. Jan. 22, 2010) ("[D]ifferent adversary proceedings in the same main case do not constitute different 'cases.'").

Some courts have worried that wholesale incorporation of a pleading can lead to "confusing and inconvenient" results. *Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 446–47 (E.D. Va. 2009) (footnote omitted), *aff'd*, 382 F. App'x 256 (4th Cir. 2010). That is not a concern in these proceedings. Defendants, like many subsequent transfer defendants in this SIPA proceeding, are aware of what has been filed in the other adversary proceedings in this SIPA liquidation.

Allowing the Trustee to incorporate the Luxalpha Complaint by reference does not prejudice the Defendants. If the Court were to dismiss this Complaint and permit the Trustee to amend his Complaint to include all of the allegations that are already contained in the Luxalpha Complaint, all parties would be prejudiced by delay in this proceeding. *See Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479,

at *4 (Bankr. S.D.N.Y. Aug. 6, 2021) ("Rule 15 places no time bar on making motions to amend

pleadings and permits the amending of pleadings 'when justice so requires.'").

Through the adoption of the Luxalpha Complaint, the Trustee has adequately pleaded,

with particularity, the avoidability of the initial transfer (despite the safe harbor, which will be

discussed in more detail below) due to Groupement's knowledge of BLMIS' fraud.  (Luxalpha

Compl. ¶ 6) ("Defendants knew BLMIS was operating a fraud."); (*id.* ¶ 322) ("Access

Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their

conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds."); (*id.* ¶ 106)

(Littaye and Villehuchet were directors of Groupement Financier); (*id.* ¶ 107) (Delandmeter was

a Legal Adviser to Groupement Financier); (*id.* ¶ 323) ("The Access Defendants and UBS

Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct

knowledge of fraud at BLMIS is imputed to these two funds."); *see also UBS AG*, 647 B.R. at 63

("Their knowledge of BLMIS' fraud can be imputed to Groupement Financier.").

Natixis FP argues that incorporation of the entirety of the Luxalpha Complaint violates

Rule 8's requirement for "a short and plain statement."  (Mem. L. at 24, ECF No. 18); Fed. R.

Civ. P. 8(a)(2).  The Court disagrees.  Defendants have been familiar with the allegations

contained in the Luxalpha Complaint since, at latest, the commencement of this case.

Defendants have been privy to information that this Court has not seen.  Groupement and its

agreements have complicated structures with various insiders, many of whom are alleged to have

had knowledge of BLMIS' fraud.  (*see, e.g.,* Luxalpha Compl. ¶ 139) (showing a chart of

overlapping and connected insiders between two Groupement entities).  The Trustee would need

to re-plead nearly the entire Luxalpha Complaint to demonstrate that the initial transfer is

voidable. Insisting that the Trustee re-allege all of the allegations contained in that complaint is unnecessary, burdensome, and duplicative.

The Trustee has plead relevant portions of the Luxalpha Complaint to demonstrate that the initial transfer is voidable. This Court has reviewed the Luxalpha Complaint and found that the Trustee has incorporated relevant portions. Insisting that the Trustee re-allege all of the allegations contained in the Luxalpha Complaint is an unnecessary, dilatory tactic by Defendants.

**The Safe Harbor Does Not Bar the Avoidance of the Initial Transfers**

Defendants have raised the "safe harbor" defense, found in § 546(e), to the Trustee's allegations. Section 546(e) is referred to as the safe harbor because it protects a transfer that is a "settlement payment ... made by or to (or for the benefit of) a ... financial institution [or] financial participant," or that is "made by or to (or for the benefit of) a ... financial institution [or] financial participant ... in connection with a securities contract." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

The safe harbor does not apply, by its plain terms, to transfers where the transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any transferee who knew the transfers it received from Madoff Securities contained only stolen proceeds also knew those transfers were neither settlement payments [n]or transfers in connection with a security agreement" and therefore, § 546(e) cannot apply. *Id.* On the issue of the safe harbor, the Court adopts the district court's reasoning in: *Multi-Strategy,* 2022 WL 16647767.

The district court has already determined that,

> those defendants who claim the protections of Section 546(e) through a Madoff
> Securities account agreement but who actually knew that Madoff Securities was a
> Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor,
> and their motions to dismiss the Trustee's claims on this ground must be denied.

*Cohmad*, 2013 WL 1609154, at *10; *see also Multi-Strategy*, 2022 WL 16647767, at *7 ("[I]n

circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e)

d[oes] not apply as a matter of its express terms.").

> The safe harbor was intended, among other things, to promote the reasonable
> expectations of legitimate investors.  If an investor knew that BLMIS was not
> actually trading securities, he had no reasonable expectation that he was signing a
> contract with BLMIS for the purpose of trading securities for his account.  In that
> event, the Trustee can avoid and recover preferences and actual and constructive
> fraudulent transfers to the full extent permitted under state and federal law.

*Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016) (internal

citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A. (In re*

*BLMIS*), 12 F.4th 171 (2d Cir. 2021)).

The Trustee has alleged that Groupement knew the payments it received from BLMIS

were neither settlement payments nor payments in connection with a securities contract.

(Compl. ¶ 75, ECF No. 1) ("Groupement received each of the Groupement Six Year and Two

Year Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware

of suspicious facts that would have led Groupement to inquire further into the BLMIS fraud.").

The Court has already determined on the basis of the Luxalpha Complaint that Groupement

knew of the BLMIS fraud.  *UBS AG*, 647 B.R. at 63.  In reaching that conclusion, the court

determined that,

> [t]he Feeder Funds are not natural persons and, as such, act only through 'the
> instrumentality of their officers or other duly authorized agents.' *45 John Lofts,*
> *LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 743
> (Bankr. S.D.N.Y. 2019). An agent's knowledge and acts are imputed to a

corporate defendant. *Id.*; (Am. Compl. ¶¶ 315–323) (alleging imputation of knowledge). UBS, Littaye, Villehuchet, and all of the Access Defendants are agents or officers of Luxalpha whose knowledge can be imputed to Luxalpha. (Am. Compl. ¶ 125) (UBS SA was Luxalpha's agent); (*id.* ¶ 180) ('UBS SA was, by law, responsible for both the safekeeping and the supervision of [Luxalpha]'s assets.'); (*id.* ¶ 101) (Littaye was a director of Luxalpha); (*id.* ¶ 102) (Delandmeter was a director of Luxalpha); (*id.* ¶ 322) ('Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.'). Similarly, Littaye, Villehuchet, Delandmeter, and all of the UBS and Access Defendants are agents or officers of Groupement Financier. (*Id.* ¶ 106) (Littaye and Villehuchet were directors of Groupement Financier); (*id.* ¶ 107) (Delandmeter was a Legal Adviser to Groupement Financier); (*id.* ¶ 323) ('The Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.'). Their knowledge of BLMIS' fraud can be imputed to Groupement Financier.

*Id.* at 62–63.

"In sum, if the Trustee sufficiently alleges that the [initial] transferee from whom he seeks to recover a fraudulent transfer knew of [BLMIS]'[s] fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021). Where § 546(e) does not "embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). The Trustee's allegations in the Luxalpha Complaint are sufficient to survive a Rule 12(b)(6) motion on this issue.

Whether the safe harbor applies to the initial transfers under the theory that BLMIS' transfers to Groupement were made in connection with the Groupement's contracts with Defendants (rather than a contract with BLMIS) is not answerable on the pleadings. If such a

fact-specific determination is needed, the Court will make it with the benefit of a "full factual

record." *Multi-Strategy* 2022 WL 16647767, at *9.

**546(g) Safe Harbor**

Defendants argue that the Trustee's claims for recovery of the transfers are barred by the

§ 546(g) safe harbor. (Mem. L. at 17, ECF No. 18).  Defendants state that under the facts alleged

in the Complaint and under "Judge Rakoff's *ABN Amro* decision, the elements of Section 546(g)

are satisfied, thus barring the Six-Year Bloom Redemptions." (Reply at 11, ECF No. 24).

Section 546 is commonly referred to as the "safe harbor" because it protects certain

transfers from being clawed back into the estate by the Trustee.  Section 546(g) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the
> trustee may not avoid a transfer, made by or to (or for the benefit of) a swap
> participant or financial participant, under or in connection with any swap
> agreement and that is made before the commencement of the case, except under
> section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g).  Section 546(g) protects only an initial transfer and not subsequent transfers.

*Picard v. ABN AMRO (Ireland) Ltd. (In re BLMIS)*, 505 B.R. 135, 143 (S.D.N.Y. 2013) ("[T]his

Court also rejects the defendants' assertion that section 546(g)'s safe harbor should be extended

to apply to subsequent transfers sought to be recovered by the Trustee under section 550").

Subsequent transferees are entitled to "raise § 546(g) as a defense to the avoidability of the initial

transfers that they eventually received even if the initial transferees of those funds failed to raise

the defense." *Id.* at 144.

To apply the 546(g) safe harbor, the moving party must show that the initial transfer was

made "in connection with" a swap agreement and "by or to (or for the benefit of) a swap

participant or financial participant.  *Id.* at 144.  "Unlike section 546(e), the issue of knowledge is

irrelevant to the application of section 546(g)." *Id.* at 142 n.6.  Where "there is no dispute that

the swap transactions actually occurred . . . the mindset of the participants in those transactions is

irrelevant." *Id.*  There is no "Ponzi scheme or fraud 'exception' to section 546(g)'s safe harbor."

*Id.* at 142.  Section 546(g)'s requirement that a transfer be made "in connection with any swap

agreement" simply means that the transfer must be related to such an agreement.  *Id.* at 145.

      The Trustee argues that *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. ----, 138

S. Ct. 883, 200 L. Ed. 2d 183 (2018), controls here.  (Opp'n at 24–25, ECF No. 22).  The

Supreme Court analyzed the text of § 546(e), explaining that

> [t]he transfer that the 'the trustee may not avoid' is specified to be 'a transfer that
> is' either a 'settlement payment' or made 'in connection with a securities
> contract.' § 546(e) (emphasis added). Not a transfer that involves. Not a transfer
> that comprises. But a transfer that is a securities transaction covered under §
> 546(e). The provision explicitly equates the transfer that the trustee may otherwise
> avoid with the transfer that, under the safe harbor, the trustee may not avoid. In
> other words, to qualify for protection under the securities safe harbor, § 546(e)
> provides that the otherwise avoidable transfer itself be a transfer that meets the
> safe-harbor criteria.

*Merit Mgmt.* 138 S. Ct. at 894.  The Court's analysis pertains to the statutory language of §

546(e), not 546(g).  The former limits the safe harbor to certain transfers made "in connection

with a securities contract," while the latter limits the safe harbor to certain transfers "under or in

connection with any swap agreement."  11 U.S.C. §§ 546(e), (g).  The *Merit Management*

decision does not once mention § 546(g).  The Court will follow the District Court's analysis of

§ 546(g) safe harbor in *ABN Amro Bank*, 505 B.R. 135.

<u>Made by or to (or for the benefit of) a . . . financial participant</u>

> The question that remains is whether the initial transfers were made 'by or to (or
> for the benefit of)' defendants. Because the initial transfers were made by Madoff
> Securities and to the investment funds, not defendants, the transfers must have
> been made for defendants' benefit for section 546(g) to apply.

*Id.* at 149.  One of the "parties to the initial transfer must have contemplated that defendants

would benefit from the transfer."  *Id.* at 149.  The Defendants cannot claim the protection of the

546(g) safe harbor where the facts may support that the Defendants' benefit from the receipt of
the funds "would not have been within the contemplation of either Madoff Securities or the
investment funds themselves." *Id.* at 150.

The Complaint does not allege on its face that the transfers were made for the benefit of
the Defendants. Whether the initial transfers were made for the benefit of the Defendants is a
factual question that is better left to a later stage of the proceeding. 505 B.R. at 149–50; *Picard
v. ABN AMRO Bank N.V. (In re Madoff)*, Adv. Pro. No. 10-05354 (CGM), 2023 WL 2358746, at
*12 (Bankr. S.D.N.Y. Mar. 3, 2023) ("Discovery may show that the Rye Funds withdrew from
BLMIS weeks or even months after a redemption request was made by a subsequent transferee
like the Defendant. This fact-intensive accounting problem is an issue to be decided at a later
stage of litigation.").

The Defendants argue that the Trustee alleged in Adv. Pro 10-05353 that the transfers
were made for the benefit of the Defendants. (Mem. L at 21 n.22, ECF No. 18). Defendants
argue that "A party [] cannot advance one version of the facts in its pleadings, conclude that its
interests would be better served by a different version, and amend its pleadings to incorporate
that version." *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) (citation
omitted); *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018)
("BNP Paribas") (noting that court may consider prior pleadings with statements "inconsistent
with the latest version").

As this Court stated in *BNP Paribas*,

[i]n deciding the motion, "courts must consider the complaint in its entirety, as
well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)
motions to dismiss, in particular, documents incorporated into the complaint by
reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d
179 (2007). Moreover, a court may consider prior iterations of pleadings

containing statements inconsistent with the latest version. *See Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) ('A party cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version.') (quoting *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ) (alterations omitted), appeal docketed, 17-2783 (2d Cir. Sept. 7, 2017).

*BNP Paribas*, 594 B.R. at 195. The Court then considered a complaint that was incorporated by reference into the Trustee's proposed amended complaint. *Id.*

Here, the Complaint does not incorporate the facts taken from the complaint in Adv. Pro 10-05353. The Court will not consider the allegations there as appearing on the face of this Complaint. "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up). A "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the [affirmative] defense." *Id.* Without additional facts, the Court cannot say that the Trustee can prove "no set of facts in support of his claim." *Id.*

Fraudulent initial transfers made within two years of the filing date are avoidable despite §§ 546(e) or (g). The Trustee has alleged that Groupement received over $275 million from BLMIS within two years of the filing date. The safe harbor does not bar avoidance of these transfers.

**Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances**

Defendants argue that the Trustee may not rely on the Ponzi scheme presumption, which the Defendants describes as a "judicially-created shortcut that is not settled law." (Mem. L. at 26, ECF No. 18). Defendants argue that Judge Menashi's concurrence in *Citibank* controls: "Judge Menashi explained that the 'Ponzi scheme presumption' presents a 'questionable' application of fraudulent transfer statutes." (*Id.*). Reliance on that concurrence is misplaced.

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to hinder, delay, or defraud." 11 U.S.C. § 548(a)(1)(A). Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied. (Compl. ¶¶ 22–38). (Madoff pled guilty to operating a Ponzi scheme through BLMIS). The "Ponzi scheme presumption" allows courts to presume actual intent to defraud on part of the operator of the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.").

In this case, the Ponzi scheme presumption allows the Court to presume that BLMIS made the initial transfers with actual intent to defraud because Madoff has admitted to operating a Ponzi scheme. The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007). The "Ponzi scheme presumption" makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore every transfer made by BLMIS was made with actual intent to defraud in order to ensure that Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS'
actual fraudulent intent is presumed via the Ponzi scheme presumption. Intent to defraud is
established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311
(SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith
Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi scheme presumption
pursuant to which all transfers are deemed to have been made with actual fraudulent intent");
*Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("the fraudulent intent
on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi
scheme presumption'"). That BLMIS operated as a Ponzi scheme is well-established and the
Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading
BLMIS' actual intent on this issue. *See Picard v. Legacy Capital Ltd.*, 603 B.R. 682, 688–93
(Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a Ponzi scheme and why the
Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law).

This Court has re-read Judge Menashi's concurrence in *Citibank* and finds it to be
unpersuasive. The Ponzi scheme presumption does not turn would-be preferences into
fraudulent transfers. All the Ponzi scheme presumption does is save the Trustee and the courts
time and resources by presuming that each transfer was made with actual fraudulent intent. As
the District Court has stated, "[n]otwithstanding Judge Menashi's concerns, 'the Ponzi scheme
presumption remains the law of this Circuit.'" *Picard v. Sage Realty*, No. 20 CIV. 10057 (JFK),
2022 WL 1125643, at *28 (S.D.N.Y. Apr. 15, 2022), *aff'd sub nom. In re Bernard L. Madoff Inv.
Sec. LLC*, No. 22-1107, 2023 WL 5125596 (2d Cir. Aug. 10, 2023), and *aff'd sub nom. In re
Bernard L. Madoff Inv. Sec. LLC*, No. 22-1107, 2023 WL 5439455 (2d Cir. Aug. 24, 2023)
(citing *Gredd*, 397 B.R. at 11); *see also Brown v. Picard (In re BLMIS)*, No. 22-CV-3882 (VEC),

2023 WL 4744195, at *5 (S.D.N.Y. July 25, 2023) ("The Bankruptcy Court correctly concluded

that the transfers at issue in this case are subject to the presumption of fraudulent intent that

applies to a Ponzi scheme.").  The Court agrees with "every court to opine on the application of

the presumption in the context of the BLMIS Ponzi scheme" and will not now discard the

presumption.  *Sage Realty*, 2022 WL 1125643, at *28.

**BLMIS Customer Property**

Defendants argue that the Complaint fails to plead that transfers were comprised of

BLMIS customer property.  (Mem. L. at 34, ECF No. 18).  The Trustee has pleaded that "[b]ased

on the Trustee's investigation to date, at least $80.9 million was transferred from Groupement to

Bloom pursuant to the hedging structure created to support the Groupement Swap."  (Compl. ¶

78, ECF No. 1); (*see also id.* Ex. C).  The Complaint sets forth the initial transfers of customer

property from BLMIS to Groupement.  (*Id.* Ex. A, B).

The Complaint states that "[b]ased on the Trustee's investigation to date, at least $153

million was transferred from [Groupement FLL] to Natixis FP."  (*Id.* ¶ 79).  The Complaint

explains that Groupement FLL "obtained these funds by redeeming the Groupement shares that

had been previously held by Bloom to hedge the Groupement Swap. [Groupement FLL] then

transferred the amounts received from its redemption of Groupement shares and thus indirectly

from BLMIS to Natixis FP in settlement of the Groupement Swap."  (*Id.*).  The Complaint sets

forth the transfers of customer property from BLMIS to Natixis FP.  (*Id.* Exs. A, B, D).

The exhibits to the Complaint provide Defendants with the exact date and amount of each

transfer the Trustee is seeking to recover.  These exhibits provide Defendants with the "who,

when, and how much" of each transfer.  *BNP Paribas S.A.*, 594 B.R.at 195.

Defendants argues that the Complaint fails to tie the initial transfers from BLMIS to

Groupement to the subsequent transfers to Defendants.  (Mem. L. at 35, ECF No. 18) ("it does

not specify which, if any, of the Initial Transfers included the BLMIS funds that the Trustee

alleges Groupement subsequently transferred to Defendants, let alone how those transfers are

tied.").

    The Court has already addressed this argument in its multitude of prior decisions in

similar Fairfield Sentry subsequent transfer proceedings.  *See, e.g., Picard v. Parson Fin.*

*Panama S.A. (In re BLMIS)*, No. 08-01789 (CGM), 2022 WL 3094092, at *10–11 (Bankr.

S.D.N.Y. Aug. 3, 2022).

> The Fairfield Complaint, which is incorporated by reference into this,
> alleges that the Fairfield Fund was required to invest 95% of its assets in BLMIS.
> (Fairfield Compl. ¶ 89); see also (Fairfield Compl. ¶ 91) ('From the beginning, to
> comport with Madoff's requirement for BLMIS feeder funds, Fairfield Sentry
> ceded control of not only its investment decisions, but also the custody of its
> assets, to BLMIS.').
>     The Complaint plausibly alleges that Fairfield Sentry did not have any
> assets that were not customer property. Defendants ask this Court to consider
> allegations made in the other complaints filed by the Trustee in this SIPA
> proceeding. Memo. L. at 22, ECF No. 93. These complaints have not been
> adopted by reference by the Trustee in this adversary proceeding and, as such, are
> not within the Court's power to consider on a Rule 12(b)(6) motion. *Williams v.*
> *Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) ('A district court, in deciding
> whether to dismiss a complaint under Rule 12(b)(6), is generally limited to the
> facts as presented within the four corners of the complaint, to documents attached
> to the complaint, or to documents incorporated within the complaint by
> reference.') (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir.
> 2002)).
>     Taking all allegations as true and reading them in a light most favorable to
> the Trustee, the Complaint plausibly pleads that Parson received customer
> property because Fairfield Sentry did not have other property to give. The
> calculation of Fairfield Sentry's customer property and what funds it used to make
> redemption payments are issues of fact better resolved at a later stage of litigation.

*Id.*  Similarly, the Complaint here has plead that the feeder fund, Groupement, invested entirely

in BLMIS.  (Compl. ¶ 3, ECF No. 1).  The Complaint plausibly alleges that Groupement did not

have any assets that were not customer property.  Taking all allegations as true and reading them

in a light most favorable to the Trustee, the Complaint plausibly pleads that Defendants received

customer property because Groupement did not have other property to give. The determination

of which specific funds it used to make redemption payments are issues of fact better resolved at

a later stage of litigation.

**Whether Defendants took the transfers for value, in good faith, and without knowledge of the voidability of the initial transfers?**

Defendants have raised the "good faith defense" under § 550(b), arguing that this Court

should dismiss the Trustee's complaint because they took "for value," "in good faith," and

"without knowledge of the voidability of the transfers."  (Mem. L. at 36, ECF No. 18).

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule

12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of

the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  "Not

only must the facts supporting the defense appear on the face of the complaint, but, as with all

Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up).  A "plaintiff is entitled to all

reasonable inferences from the facts alleged, not only those that support his claim, but also those

that defeat the [affirmative] defense."  *Id.*

    i.    *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient

to support a simple contract, analogous to the 'value' required under state law to achieve the

status of a bona fide purchaser for value."  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548

B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special*

*Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In

addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than

what the transferor received.

Defendants argue that the redemptions were received in exchange for surrendering equity

interests, thereby constituting value.  (Mem. L. at 36, ECF No. 18).  If Defendants knew at the

time it redeemed their shares that the shares were worthless, then it did not receive the

subsequent transfer funds "for value" as is required under § 550.  *See Fairfield Sentry Ltd. v.*

*Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 301 (Bankr. S.D.N.Y.

2018), *aff'd sub nom. Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB),

2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) ("The only exception concerns the Knowledge

Defendants that received redemption payments with the knowledge that the NAV was wrong. In

those circumstances, the Liquidators may seek to impose a constructive trust.").  It has not yet

been determined whether Defendants knew if the shares they redeemed from Groupement had

value.

 "Value" is Defendants' burden to plead and prove.  *Picard v. BNP Paribas S.A.* (*In re*

*BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether the Defendants gave value is a

question of fact to be resolved either at the summary judgment stage or at trial.  *Picard v.*

*Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL

3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021).

ii.    *Good Faith*

Where, in light of surrounding circumstances, a transferee should have known of the

debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith,

unless an investigation into the debtor's financial condition actually discloses no reason to

suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court explained that

good faith is a fact-intensive inquiry that almost always requires a trial: "The Second Circuit

made clear in its decision in [*Picard v.*] *Citibank*[*, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir.

2021), *cert. denied* No. 21-1059 (Feb. 28, 2022)] that the inquiry notice standard requires a 'fact-

intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the

disparate circumstances of differently-situated transferees.'"  *In re BLMIS, LLC*, Dec. & Order,

20-cv-02586(CM) (May 2, 2022).  And that "such a fact-based determination can only be made

based on the entirety of the factual record after discovery . . . ." *Id.* (internal quotation omitted).

        The burden of proving good faith falls squarely on Defendants, and this Court cannot

make a determination on Defendants' affirmative defense until after a fact-intensive inquiry.

Discovery is required on this issue.

        *iii.    Knowledge of the Voidability*

        Good faith is linked with whether one had knowledge of the voidability of the transfer.

*Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does

not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of

the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d

217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of

a complaint, the Court must deny the Defendants' motion on this element.  Additionally, §

550(b)(1) provides a defense to recovery making lack of knowledge Defendants' burden to plead

and prove.  It is a fact-intensive inquiry that requires a three-step inquiry into 1) what Defendants

subjectively knew; "whether these facts put [Defendants] on inquiry notice of the fraudulent

purpose behind a transaction—that is, whether the facts the transferee knew would have led a

reasonable person in the [Defendants'] position to conduct further inquiry into a debtor-

transferor's possible fraud; and whether "diligent inquiry by [Defendants] would have

discovered the fraudulent purpose of the transfer." *Id.* at 192.

It is not appropriate for the Court to resolve these factual issues at this stage of the

litigation.

**The Alpha Prime Settlement**

The Trustee and Alpha Prime entered into a settlement on June 20, 2022, in *Picard v.

HSBC Bank PLC*, Adv. Pro. No. 09-01364 (CGM) (Bankr. S.D.N.Y.) (the "Alpha Prime

Action"). That settlement states in relevant part:

> the Trustee, on behalf of himself and BLMIS, and its consolidated estates, hereby
> releases, acquits and forever discharges Alpha Prime and Alpha Prime Asset
> Management LTD and its respective current and former directors . . . officers,
> employees, direct or indirect shareholders, limited partners, principals, members,
> successors, assigns, accountants, attorneys, from any and all past, present or
> future actions, causes of action, suits, debts, dues, sums of money, accounts,
> reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages,
> judgments, and claims whatsoever, asserted or unasserted, known or unknown,
> arising out of or in any way related to Madoff or BLMIS. For the avoidance of
> doubt, Alpha Prime is not released from the Six-Year Transfer Recovery Claim
> until either (i) Alpha Prime has paid to the Trustee the Six-Year Transfers or (ii)
> the Six-Year Transfers are deemed unrecoverable from Alpha Prime as set forth
> in paragraphs 5 above and 10 below.

(Cioffi Decl. Ex. 7 ¶7 Alpha Prime Settlement Agreement, ECF No. 19) (the "Settlement").

Defendants argues that this settlement releases the Trustee's claims against it in this adversary

proceeding. (Mem. L. at 6, ECF No. 18). The Trustee argues that the Alpha Prime Settlement

"neither releases Defendants from the Groupement Claims, nor impacts claims related to any

other subsequent transfers from feeder funds other than Alpha Prime." (Opp'n at 8, ECF No.

22). Under the Trustee's reading, "the Settlement unambiguously establishes that the Trustee

and Alpha Prime intended that the Trustee release claims for transfers from Alpha Prime only."

(*Id.* at 9).

A release is a type of contract governed by principles of contract law.  *See Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.,* 273 F.3d 509, 514 (2d Cir.2001); *Ackoff–Ortega v. Windswept Pac. Entm't Co.,* 120 F. Supp. 2d 273, 282 (S.D.N.Y.2000), *aff'd,* 46 Fed. Appx. 663 (2d Cir. 2002); *Zilinskas v. Westinghouse Elec. Corp.,* 248 A.D.2d 777, 669 N.Y.S.2d 703, 705 (1998).  In determining the scope and validity of the release, courts should apply state law.  *See Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993) (applying state law to interpret agreements, even where "federal law governs the validity of releases of federal causes of action.").

"It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties."  *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n,* No. 21-70-CV, 2021 WL 6060710, at *2 (2d Cir. Dec. 20, 2021) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)); *Olin Corp.*, 5 F.3d at 15 (stating that under New York law, courts must "discern the intent of the parties to the extent their intent is evidenced by their written agreement.")(internal quotation omitted); *see also Golden Pac.,* 273 F.3d at 515 ("Under New York law, a release-like any contract-must be construed in accordance with the intent of the parties who executed it."). Where a release is unambiguous, it must be enforced according to its terms without resort to extrinsic evidence.  *See Ackoff–Ortega,* 120 F. Supp. 2d at 282; *Zilinskas,* 669 N.Y.S.2d at 705. Where an agreement is ambiguous, the court may look to extrinsic evidence to determine the parties' intent. *Golden Pac.,* 273 F.3d at 517.  Whether a contract is ambiguous is a question of law for the court, and if there is ambiguity, the meaning of the contract generally presents a triable issue of fact.  *See id.* at 514–15.

In interpreting the Settlement, the Court must read the agreement "as a whole, and every part will be interpreted in reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.,* 100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667, 670 (2003) (internal quotations omitted); *see also Empire Props. Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 248, 43 N.E.2d 25 [1942]. Where possible, a contract should be "interpreted as to give effect to its general purpose." *EVRYTHNG Ltd. v. Avery Dennison Retail Info. Servs., LLC*, No. 21-CV-4411 (LJL), 2021 WL 11592336, at \*15 (S.D.N.Y. Aug. 2, 2021) (quoting *Ins. Co. of N.Y. v. Cent. Mut. Ins. Co.*, 850 N.Y.S.2d 56, 58 (2008). The "scope of a release turns on the controversy being settled and the purpose for which the release was actually given." *ASI Sign Sys., Inc. v. Architectural Sys., Inc.,* No. 98 Civ. 4823, 1999 WL 553825, at \*5 (S.D.N.Y. July 29, 1999); *see also Cahill v. Regan,* 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505, 510 (1959); *Hughes v. Long Island Univ.,* 305 A.D.2d 462, 762 N.Y.S.2d 401, 401 (2003).

"[G]eneral language" included in a release, such as a release of "any and all claims," should be interpreted in light what claims the parties intended to waive. *Lucent Techs., Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195, 1200 (S.D. Cal. 2007). "Mere use of general language is not sufficient to evidence a release of unrelated claims." *Id.*

> [R]eleases contain standardized, even ritualistic, language and are given in circumstances where the parties are sometimes looking no further than the precise matter in dispute that is being settled. Thus, while it has been held that an unreformed general release will be given its full literal effect where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement, the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form....

*Mangini v. McClurg*, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969) (internal citations omitted). The "consideration involved in the 'Settlement Agreement'" may be

particularly helpful in interpreting the intent of the parties.  *See Consol. Edison, Inc. v. Ne. Utilities*, 332 F. Supp. 2d 639, 648 (S.D.N.Y. 2004).

The Trustee argues that the Settlement reflects a controversy relating only to the receipt of Alpha Prime's BLMIS account, that the doctrine of *ejusdem generis* establishes that the release applies only to claims for Alpha Prime transfers, and that there was no consideration for releasing the Defendants.  (Opp'n at 8–12, ECF No. 22).

The Trustee argues that the doctrine of *ejusdem generis* demonstrates the release does not apply to the claims against Defendants in this proceeding.  (Opp'n at 28, ECF No. 209).  In New York, interpretation of the purpose and context of language follows the principle of *ejusdem generis*, by which 'the general words of a release are limited by the recital of a particular claim.'"  *Consol. Edison*, 332 F. Supp. 2d at 647–48 (quoting *Herman v. Malamed*, 110 A.D.2d 575, 487 N.Y.S.2d 791, 793 (1985)); *see also Vines v. Gen. Outdoor Adver. Co.*, 171 F.2d 487, 492 (2d Cir. 1948) (Hand, J.) ("[I]n a release[,] words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims.").

> [C]ourts have often applied the rule of ejusdem generis, and held that the general words of a release are limited by the recital of a particular claim , where there is nothing on the face of the instrument, other than general words of release, indicating that matters other than those specifically referred to were intended to be discharged . . . .

*Green v. Lake Placid 1980 Olympic Games, Inc.*, 147 A.D.2d 860, 862, 538 N.Y.S.2d 82, 84 (1989).

The Trustee argues that the Alpha Prime Settlement resolved only issues relating to that fund's receipt of BLMIS customer property.  (Opp'n at 10, ECF No. 22).  The Settlement references:

> Alpha Prime's BLMIS account; Alpha Prime's withdrawals from that account; Alpha Prime's customer claim; the Trustee's subsequent transfer claims against

> Alpha Prime; a 2018 partial settlement between the Trustee and Alpha Prime; the Trustee's Second Amended Complaint against Alpha Prime; and those of the Trustee's claims against Alpha Prime left unresolved by the 2018 partial settlement.

(*Id.* at 10–11). None of these issues relate to the claims against Natixis FP or Bloom at issue in this proceeding and the Settlement "***never*** mentions a dispute between the Trustee and Groupement, Defendants, or any feeder fund other than Alpha Prime." (*Id.* at 11) (emphasis in opposition). These issues do relate to the claims against Alpha Prime in adversary proceeding 09-01364. (*See* Second Am. Compl. ¶ 184, Adv. Pro. No. 09-01364, ECF No. 567). Under the doctrine of *ejusdem generis*, the general words of release are limited by the specific claims in the Settlement and in that adversary proceeding.

The Trustee argues that the consideration given in the Settlement shows how the release was limited only to the transfers in the Alpha Prime action. (Opp'n at 6, ECF No. 22). The Trustee's claim against Alpha Prime at the time of the Settlement was for avoidance and recovery of approximately $6.7 million. (Cioffi Decl. Ex. 7 at 3–4, Alpha Prime Settlement Agreement at 4, ECF No. 19). In consideration of these releasees, the Settlement provides that "Alpha Prime and its agents will continue to participate in discovery in this Adversary Proceeding," and that "[a]s part of Alpha Prime's consideration for this settlement, Alpha Prime agrees to share with the Trustee 50% of the proceeds of the Luxembourg Actions and the Bermuda Actions . . . ." (*Id.* at 6–7). The consideration "plainly relates" to the release of claims for the Alpha Prime transfers. *Consol. Edison, Inc.*, 332 F. Supp. 2d at 648. Defendants admitted at oral arguments that "we should be looking at is the consideration that Alpha Prime was offering up on behalf of its direct and indirect shareholders." (Hr'g Tr. at 32:1–4, Oct. 18, 2023, ECF No. 30). The consideration described in the Settlement does not indicate that it

would release additional hundreds of millions of dollars of claims in unrelated actions, and it would violate the intent of the parties for the Court to read the Settlement as doing that.

The release, read in the full context of the Settlement, is clear on its face that it does not extend to release the claims against Defendants in this adversary proceeding. A "release may not be read to cover matters which the parties did not desire or intend to dispose of." *Cahill v. Regan*, 5 N.Y.2d 292, 299, 157 N.E.2d 505, 510 (1959). The Court finds that the release in the Alpha Prime settlement pertained to the claims asserted in the Alpha Prime Action.

**Laches**

Defendants argue that Count I of the Complaint is barred by the doctrine of laches. (Mem. L. at 27–30, ECF No. 18). "A complaint may be dismissed under Rule 12(b)(6) because it is barred by an applicable statute of limitations, . . . or on the basis of laches. . . ." *Lehman Bros. v. Giddens (In re Lehman Bros. Inc.)*, 617 B.R. 231, 239 (Bankr. S.D.N.Y. 2020), *aff'd* No. 19-3245, 2021 WL 4127075 (2d Cir. Sept. 10, 2021).

The "equitable doctrine of laches prohibits 'unreasonable, inexcusable and prejudicial delay.'" *Id.* at 246 (quoting *Sec. Inv'r Prot. Corp. v. BLMIS (In re BLMIS)*, 491 B.R. 27, 32–35 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014)). Laches carries two elements; the defendant "must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair" and that the defendant "has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Lehman Bros*, 617 B.R. at 246 (cleaned up). Laches "may be decided 'as a matter of law' when the '[plaintiff's] lack of due diligence and prejudice to the [defendant] are apparent.'" *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019) (quoting *Peters v. Sotheby's Inc.*, 34

A.D.3d 29, 38, 821 N.Y.S.2d 61 (2006)).  A "mere lapse of time, without a showing of prejudice, will not sustain a defense of laches."  *Id.* (cleaned up).

The Supreme Court has explained that "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678, 134 S. Ct. 1962, 1973, 188 L. Ed. 2d 979 (2014).  Since the doctrine of laches "may have originated in equity because no statute of limitations applied," this may suggest that "laches should be limited to cases in which no statute of limitations applies."  *Id.* (quoting 1 D. Dobbs, Law of Remedies § 2.4(4), p. 104 (2d ed. 1993)).  Applying laches within the period specified by the statute of limitations "would give judges a 'legislation-overriding' role that is beyond the Judiciary's power" and would "clash with the purpose for which the defense developed in the equity courts."  *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 335, 137 S. Ct. 954, 960–61, 197 L. Ed. 2d 292 (2017).  This Court will "adhere to the position that, in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief. . . ."  572 U.S. at 679.

The Trustee's claims for recovery of subsequent transfers against Defendant Natixis FP are timely under 11 U.S.C. § 550(f)(1).  The Court will not override the statute of limitations enacted by Congress specifically for this cause of action.

The Defendants argue that there is a distinction between legal and equitable relief when they argue:

> the Trustee seeks equitable relief from a court of equity, and, as such, laches is available even where a federal limitations period has not expired . . . . The decisions cited by the Trustee merely indicate that laches cannot be invoked to bar legal relief (typically, claims for damages) where the applicable federal limitations period has not expired, but these same decisions make clear that laches can still apply to bar equitable relief in this scenario.

(Reply at 17, ECF No. 24).

The Supreme Court noted that "[i]n extraordinary circumstances . . . the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable." *Petrella*, 572 U.S. at 685, 134 S. Ct. at 1977.  As an example of one of these "extraordinary circumstances" the Supreme Court offered a situation where a plaintiff sought not just a judgment showing infringement of copyrighted design but also the "destruction of the housing project" after "taking no steps to halt the development until more than 168 units were built, 109 of which were occupied." *Id.*  Defendants offer no similarly extraordinary circumstances here to warrant relief they seek.  And while a "federal civil action is subject to both equitable and legal defenses," (572 U.S. at 699, 134 S. Ct. at 1985 (Breyer J., dissenting)), there has been no case in which "this Court has approved the application of laches to bar a claim for damages brought within the time allowed by a federal statute of limitations."  572 U.S. at 679, 134 S. Ct. at 1974.

Defendants fail to offer convincing support for their position.  (*See* Hr'g Tr. at 39, Oct. 18, 2023, ECF No. 30).  The Bankruptcy Court found that the doctrine of laches mandated dismissal of the adversary proceeding in *Lehman Bros. v. Giddens (In re Lehman Bros. Inc.*), 617 B.R. 231, 248 (Bankr. S.D.N.Y. 2020).  In *Lehman Bros*, the applicable statute did "not contain its own statute of limitations" and was limited only by the catchall statute of limitations found in 28 U.S.C. § 1658.  *Lehman*, 617 B.R. at 244 ("[B]ecause section 541(b)(7) does not contain its own statute of limitations . . . the four-year statute of limitations contained in section 1658(a) applies to causes of action seeking relief pursuant to section 541(b)(7) of the Bankruptcy Code.").  In this case, the statute underlying the Trustee's claims against Defendants to recover

subsequent transfers, 11 U.S.C. § 550, is specifically limited by the time period contained in §

550(f).  Section 550 contains its own statute of limitation.

Defendants rely on *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186 (2d Cir. 2019), a

case where the Second Circuit Court of Appeals allowed Defendants to assert a laches defense.

(Hr'g Tr. at 40:4–21, Oct. 18, 2023, ECF No. 30).  *Zuckerman* involved a statute of limitations

specifically enacted by Congress to revive claims that "would otherwise be untimely under state-

based statutes of limitations" *Zuckerman*, 928 F.3d at 196.  Unlike in *Zuckerman*, the statute of

limitations in § 550 does not "allow[] defendants to assert equitable defenses like laches."

*Zuckerman*, 928 F.3d at 196.  It does not "explicitly set[] aside defenses at law relating to the

passage of time."  *Zuckerman*, 928 F.3d at 196 (cleaned up).

These cases are distinguishable in another key regard: the Defendants have failed to show

any unreasonable delay that has prejudiced the Defendants and has not shown any "extraordinary

undisputed facts" supporting dismissal based on the doctrine of laches.  *Id.* at 194; *Lehman*, 617

B.R. at 246.  Laches does not bar the claim brought by the Trustee in this adversary proceeding.

## <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss is denied. The Trustee shall

submit a proposed order within fourteen days of the issuance of this decision, directly to

chambers (via EOrders), upon not less than two days' notice to all parties, as required by Local

Bankruptcy Rule 9074-1(a).



/s/ Cecelia G. Morris
_____
**Dated: November 9, 2023**            **Hon. Cecelia G. Morris**
**Poughkeepsie, New York**             **U.S. Bankruptcy Judge**
                                        Page **41** of 41